[Cite as *State v. Coleman*, 2015-Ohio-3907.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
| --- | --- | --- |
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. Sheila G. Farmer, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 14-CA-82 |
| RAY COLEMAN, JR. | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING: Criminal appeal from the Richland County
Court of Common Pleas, Case No. 2014CR
0436D

JUDGMENT: Affirmed in part; Reversed in part;
Remanded

DATE OF JUDGMENT ENTRY: September 22, 2015

APPEARANCES:

For Plaintiff-Appellee

DANIEL ROGERS
Assistant Prosecuting Attorney
38 South Park Street
Mansfield, OH 44902

For Defendant-Appellant

ROBERT GOLDBERGER
10 West Newlon Place
Mansfield, OH 44902

*Gwin, P.J.*

{¶1} Appellant Ray Coleman, Jr. ["Coleman"] appeals his convictions and sentences after a jury trial in the Richland County Court of Common Pleas on one count of Illegal Manufacture of Methamphetamine in the Vicinity of a Juvenile, a first degree felony pursuant to R.C. 2925.04(A) & (C)(3)(b); one count of Illegal Assembly or Possession of Chemicals for Manufacturing of Methamphetamine in the Vicinity of a Juvenile, a second degree felony pursuant to R.C. 2925.041 (A) & (C)(2); and one count of Aggravated Possession of Drugs, a fifth degree felony pursuant to R.C. 2925.11(A) & (C)(1)(a).

*Facts and Procedural History*

{¶2} In April 2014, Julie Starcher ("Julie") signed a lease with Joseph Perry and moved into a trailer at 352 1/2 Boston Avenue, Mansfield, Ohio with Coleman, her boyfriend of six years. Between April 10, 2014 and May 19, 2014, Coleman purchased medicine containing pseudoephedrine-the primary ingredient in methamphetamine, on six (6) different occasions from four (4) different pharmacies,

1. On April 10, 2014, Coleman went to the CVS pharmacy at the corner of W. 4th St. and Trimble Ave. in Mansfield and purchased medicine containing 2.4 grams of pseudoephedrine;

2. On April 13, 2014, Coleman went to the same CVS pharmacy at the corner of W. 4th St. and Trimble Ave. and purchased medicine containing 2.4 grams of pseudoephedrine;

3.      On April 15, 2014, Coleman went to the Wal-Mart pharmacy in Ontario and purchased medicine containing 2.4 grams of pseudoephedrine;

4.      On May 16, 2014, Coleman went to Kroger pharmacy in Mansfield and purchased medicine containing 2.4 grams of pseudoephedrine;

5.      On May 18, 2014, Coleman returned to Wal-Mart pharmacy in Ontario and purchased medicine containing 2.4 grams of pseudoephedrine; and

6. On May 19, 2014, Coleman went to Wal-Mart pharmacy in Mansfield and purchased medicine containing 2.4 grams of pseudoephedrine.

**{¶3}** On April 20, 2014, Julie's grandson Au.A. and granddaughter Al.A. moved into the home In early May 2014, Julie had Joseph Perry amend the lease for the home to include Coleman's name.

**{¶4}** In mid-May 2014, Charlie Ledbetter ("Charlie") and Deanna Hebert ("Deanna") moved in with Julie.  Around this time period, Julie asked Au.A and Al.A's mother, Toni Starcher ("Toni"), to take the children back with her to Sandusky. Julie also amended her lease with Joseph Perry again by removing Coleman's name and having the locks changed.  However, Coleman continued to live with Julie.

**{¶5}** In late May 2014, Julie asked Charlie and Deanna to move out. On approximately June 3, 2014, Au.A., Al.A. and Toni all moved in with Julie and Coleman.

**{¶6}** On June 7, 2014, during the late morning or early afternoon, Charlie came to the residence and asked if he could take Al.A and Au.A. Toni, along with her sister

Sydney Starcher ("Sydney"), gave Charlie permission to take Au.A, but did not let Al.A. go because Al.A. was suffering from a severe eczema outbreak.

{¶7} At approximately 3:00 p.m., Mansfield Police received a domestic disturbance call involving a man and a woman and a potential methamphetamine lab at the residence.

{¶8} Officers Shane Gearhart and Michael Garn were the first to respond. Upon arrival, Officers Gearhart and Garn encountered Julie, Toni and Sydney standing in front of the residence with Al.A. sitting in a car seat on the front steps. Officers Gearhart and Garn interviewed the three women and determined that there was an argument involving two of the women, but no men were involved and there were no injuries. Julie also told Officer Garn about the methamphetamine lab in the bedroom she shared with Coleman and that Coleman was still inside the home.

{¶9} Officers Gearhart and Garn approached the front door, knocked on the door and ordered Coleman to come out. Coleman complied. Coleman claimed that Charlie had been cooking meth in that room.

{¶10} Sergeant Donald Rhinehart and Lieutenant Newberry arrived on scene. After consulting with Officer Garn, Sergeant Rhinehart called Sergeant Petrycki of the Mansfield Police Department Drug Task Force. Sergeant Petrycki told Sergeant Rhinehart to briefly enter the residence to confirm the presence of materials or equipment consistent with a methamphetamine lab, then get out and contact Detective Perry Wheeler, a member of the Metrich Drug Task Force and an expert on methamphetamine manufacturing.

{¶11} Sergeant Rhinehart and Lieutenant Newberry entered the home through the side door, which was the closest entrance to the bedroom containing the methamphetamine lab. Upon entering the bedroom, Sergeant Rhinehart discovered several items commonly used in the production of methamphetamine, including camping fuel, drain cleaner and a coffee grinder covered in white powder. Sergeant Rhinehart quickly exited the bedroom and called Detective Wheeler. Sergeant Rhinehart remained at the scene until Officer James Reed arrived.

{¶12} Approximately 30 minutes after Officers Gearhart and Garn had arrived, Julie received a text message from Charlie saying he had Al.A. and would only return him in exchange for money or pseudoephedrine. Julie told Officer Gearhart about the text message. Officer Gearhart and Julie went to Charlie's new address on Koogle Rd. to investigate.

{¶13} During this time, an ambulance was called for Al.A., as officers were concerned that her rash was actually chemical burns caused by exposure to toxic gases emanating from the methamphetamine lab. However, doctors examined Al.A. and determined that her rash was caused by a severe outbreak of eczema.

{¶14} Officer James Reed arrived at approximately 4:00 pm and maintained the scene until Detective Wheeler arrived. Upon his arrival, Detective Wheeler put on his protective body suit, gloves, boots and breathing mask and entered the bedroom. Detective Wheeler discovered the following products and equipment commonly used in the production of methamphetamine inside the bedroom,

1. Coleman and butane fuel,

2. Drain cleaner fluid containing sulfuric acid,

3. Drain cleaner powder containing lye,

4. Muriatic acid,

5. cold packs-including one with the ammonium nitrate crystals removed,

6. Morton's table salt,

7. Stripped lithium,

8. Various glass containers including multiple jars covered in white powder residue,

9. A rubber glove,

10. Coffee filters,

11. A coffee grinder covered in white powder residue

12. A plastic filtering system,

13. Plastic bags,

14. Two "one pot shake and bake" pots,

15. A coffee can containing white powder residue and a straw,

16. Rubber hosing, and

17. A razor blade covered in white powder residue

{¶15} Detective Wheeler sent some items found in the bedroom, specifically a skull-shaped glass jar and a vial-both covered in white powder residue, to the Mansfield Police Department's Forensics Lab ("MPD lab") for testing. Testing by Anthony Tombasco from the MPD lab revealed that the white powder residue on the glass jar and vial was methamphetamine.

{¶16} After submitting the relevant items to the MPD lab, Detective Wheeler entered Coleman's information into NPLEx, a database that tracks purchases of pseudoephedrine. Using the information obtained from NPLEx, the Richland County Prosecutor's Office subpoenaed the records of the four pharmacies where Coleman purchased pseudoephedrine between April 10 and May 19, 2014.

{¶17} Coleman was indicted on four counts. Count 1 charged Coleman with Illegal Manufacture of Methamphetamine in the Vicinity of a Juvenile, a first degree felony pursuant to R.C. 2925.04(A) & (C)(3)(b). Count 2 charged Coleman with Illegal Assembly or Possession of Chemicals for Manufacturing of Methamphetamine in the Vicinity of a Juvenile, a second degree felony pursuant to R.C. 2925.041 (A) & (C)(2). Count 3 charged Coleman with Endangering Children, based on his allowing a child to be within 100 feet of the activities charged in Counts 1 and 2, a third degree felony pursuant to R.C. 2919.22(B)(6). Count 4 charged Coleman with Aggravated Possession of Drugs, a fifth degree felony pursuant to R.C. 2925.11(A) & (C)(1)(a).

{¶18} Coleman filed a motion to suppress on July 28, 2014. The Court held an evidentiary hearing and issued an Order overruling the motion on September 22, 2014.

{¶19} The jury trial commenced on October 9, 2014 and finished the next day. Coleman was found guilty on Counts 1, 2, 4, and not guilty on Count 3. The state conceded that Counts 1 and 4 were allied offenses of similar import and elected to have the court impose a sentence on Count 1. On October 13, 2014, the Court sentenced Coleman to seven years mandatory on Count 1 and three years mandatory on Count 2 to be served concurrently.

*Assignments of Error*

{¶20} Coleman raises three assignments of error,

{¶21} "I. APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO COUNSEL UNDER THE SIXTH AMENDMENT BY THE FAILURE OF HIS ATTORNEY TO EFFECTIVELY REPRESENT HIM.

{¶22} "II. APPELLANT WAS IMPROPERLY CONVICTED OF ALLIED OFFENSES OF SIMILAR IMPORT.

{¶23} "III. THE TRIAL COURT IMPROPERLY LIMITED THE CASE FOR THE DEFENSE."

I.

{¶24} In his first assignment of error, Coleman argues that he received ineffective assistance of counsel because his trial counsel failed to object to the admission of the pharmacy records and the testimony concerning those records. The exhibits in question, numbers 6, 7 and 8, were records from CVS, Wal-Mart and Kroger pharmacies respectively.

{¶25} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180(1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989).

**{¶26}** In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley. Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251(2009).

**{¶27}** Recently, the United States Supreme Court discussed the prejudice prong of the *Strickland* test,

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

"Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ——, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052. Even under de novo review, the standard for

judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

*Harrington v. Richter,* __U.S.__, 131 S.Ct. 770, 777-778, 178 L.Ed.2d 624(2011).

**{¶28}** "'The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.' " *State v. Fears*, 86 Ohio St.3d 329, 347, 715 N.E.2d 136(1999), *quoting State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831(1988). A defendant must also show that he was materially prejudiced by the failure to object. *Holloway*, 38 Ohio St.3d at 244, 527 N.E.2d 831. *Accord, State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶233.

**{¶29}** Coleman argues that the records from four different pharmacies detailing his six pseudoephedrine purchases between April 10, 2014 and May 19, 2014 were inadmissible and therefore his trial counsel's failure to object to their admission and the resulting testimony violated an essential duty to Coleman.

{¶30} Coleman argues that the state failed to lay a proper foundation under Evid.R. 803(6) Records of Regularly Conducted Activity,

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * *

**(6) Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

{¶31} However, the trial court heard testimony from Detective Wheeler stating that pharmacies are legally obligated to record every pseudoephedrine sale in the national NPLEx database.

{¶32} R.C. 3715.05 Requirements of retailers or terminal distributors providing pseudoephedrine or ephedrine to public; inspection of prescriptions and records by government officials and employees defines the NPLEx data base as follows,

(6) "National precursor log exchange" or "exchange" means the electronic system for tracking sales of pseudoephedrine products and ephedrine products on a national basis that is administered by the national association of drug diversion investigators or a successor organization.

{¶33} The statute imposes a duty upon retail sellers of pseudoephedrine or ephedrine products,

(B) A retailer or terminal distributor of dangerous drugs that sells, offers to sell, holds for sale, delivers, or otherwise provides a pseudoephedrine product or ephedrine product to the public shall do all of the following:

(1) Segregate pseudoephedrine products or ephedrine products from other merchandise so that no member of the public may procure or purchase such products without the direct assistance of a pharmacist or other authorized employee of the retailer or terminal distributor of dangerous drugs;

(2) With regard to each time a pseudoephedrine product or ephedrine product is sold or otherwise provided without a valid prescription:

(a) Determine, by examination of a valid proof of age, that the purchaser or recipient is at least eighteen years of age;

(b) Using any information available, including information from the national precursor log exchange if the information is accessible, make a reasonable attempt to ensure that no individual purchases or receives an

amount of pseudoephedrine product or ephedrine product that is greater than either of the following:

(i) Three and six tenths grams within a period of a single day;

(ii) Nine grams within a period of thirty consecutive days.

The maximum amounts specified in divisions (B)(2)(b)(i) and (ii) of this section apply to the total amount of base pseudoephedrine or base ephedrine in the pseudoephedrine product or ephedrine product, respectively. The maximum amounts do not apply to the product's overall weight.

*(3) Maintain a log book of pseudoephedrine product or ephedrine product purchases, in accordance with section 3715.051 of the Revised Code;*

(4) If required to comply with Section 3715.052 of the Revised Code, submit the information specified in divisions (A)(1)(a) to (d) of that section to the national precursor log exchange.

(C) Prescriptions, orders, and records maintained pursuant to this section and stocks of pseudoephedrine products and ephedrine products *shall be open for inspection to federal, state, county, and municipal officers, and employees of the state board of pharmacy whose duty it is to enforce the laws of this state or of the United States relating to controlled substances. Such prescriptions, orders, records, and stocks shall be open for inspection by the state medical board and its employees for purposes of enforcing Chapter 4731. of the Revised Code.*

Emphasis added. As required, each retailer must keep a logbook of purchases of pseudoephedrine products or ephedrine products,

(A) A retailer or terminal distributor of dangerous drugs that sells, offers to sell, holds for sale, delivers, or otherwise provides a pseudoephedrine product or ephedrine product to the public shall maintain a logbook of all purchases of pseudoephedrine products or ephedrine products made without a valid prescription. The logbook may be maintained in a tangible format, in an electronic format, or in both formats. As part of fulfilling this requirement, the retailer or terminal distributor of dangerous drugs shall do all of the following:

(1) Require each individual who purchases a pseudoephedrine product or ephedrine product without a valid prescription to sign an entry in the log book;

(2) Determine whether the name signed in the entry in the log book corresponds with the name on a government-issued identification card;

(3) Retain the log book in a tangible format, in an electronic format, or in both formats for a minimum of one year after the date of the last purchase recorded in the log book or as required by federal law;

(4) Include in the log book in the manner described in division (D) of this section or, in the alternative, post in a conspicuous location the following statement:

"Ohio law prohibits the over-the-counter purchase of a consumer product containing a total amount of base pseudoephedrine or base

ephedrine that exceeds either three and six tenths grams in a single day or nine grams within any period of thirty consecutive days. If, without a valid prescription, you purchase a consumer product containing pseudoephedrine or ephedrine, you are required to sign a log book that may be accessible to law enforcement officers and provide a government-issued identification card to verify your identity. Except in limited circumstances, the purchase of more than the permissible amount of a consumer product containing pseudoephedrine or ephedrine, and the purchase by any individual under eighteen years of age of a consumer product containing pseudoephedrine or ephedrine, are subject to criminal prosecution or delinquency proceedings in accordance with Ohio law. Also, the provision of false information concerning an individual's name, age, or other identification for the purpose of acquiring a consumer product containing pseudoephedrine or ephedrine is subject to criminal prosecution or delinquency proceedings in accordance with Ohio law."

(B) Each individual who purchases a pseudoephedrine product or ephedrine product without a valid prescription shall do both of the following:

(1) Sign and print the purchaser's name in the log book;

(2) Present a government-issued identification card to the retailer or terminal distributor of dangerous drugs to verify the purchaser's identity.

*(C) Information contained in the log book may not be used or disclosed except in the following circumstances:*

(1) In response to a court order or subpoena;

*(2) In response to a request from a law enforcement official to be used for law enforcement purposes;*

(3) For purposes of complying with requirements in section 3715.052 of the Revised Code regarding the submission of information to the national precursor log exchange.

* * *

Regarding each sale of pseudoephedrine product or ephedrine product that is not made pursuant to a valid prescription every retailer shall submit to the national precursor log exchange,

(a) The purchaser's name and address;

(b) The name and quantity of the product purchased;

(c) The date and time of the purchase;

(d) The type of government-issued identification provided by the purchaser at the time of purchase, pursuant to division (B)(2) of section 3715.051 of the Revised Code, the identification number, if any, on the identification, and the agency that issued the identification.

R.C. 3715.052.

**{¶34}** In the case at bar, Coleman complains that the pharmacy records were not made by a person with knowledge and that there was no testimony that the record were made at or near the time of the transaction. Further Coleman maintains that the testifying witnesses had no personal knowledge of the matter. Coleman argues, therefore his counsel was ineffective in failing to object to the testimony and admission

of records from four different pharmacies detailing his six pseudoephedrine purchases between April 10, 2014 and May 19, 2014.

**{¶35}** All pharmacies must maintain a log book detailing the purchase or attempted purchase. All Ohio pharmacies are required by law to report all sales and attempted sales of pseudoephedrine to a central pseudoephedrine clearing house, called NPLEx. The purpose of the NPLEx system is to monitor suspicious purchases of pseudoephedrine tablets. All purchase requests are submitted by the pharmacy to NPLEx along with the customer's driver's license. All such transactions are recorded and the information is available to law enforcement.

**{¶36}** The law affirmatively imposes the duty to record and the contents of the record. It can be assumed, therefore, the record was made at or near the time of the purchase or attempted purchase.

> In order to properly authenticate business records, a witness must "testify as to the regularity and reliability of the business activity involved in the creation of the record." *Hirtzinger* at 49, 124 Ohio App.3d 40, 705 N.E.2d 395. Firsthand knowledge of the transaction is not required by the witness providing the foundation; however "'it must be demonstrated that the witness is sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Rule 803(6).'" *State v. Vrona* (1988), 47 Ohio App.3d 145, 148, 547 N.E.2d 1189, *quoting* 1

Weissenberger's Ohio Evidence (1985) 75–76 Section 803.79. See, also,

*Moore* at ¶ 18.

*Deutsche Bank National Trust Co. v. Hansen*, 5th Dist. Fairfield No. 2010 CA 00001, 2011-Ohio-1223, ¶26.

**{¶37}** In *Soliday v. Pittenger*, 5th Dist. Richland No. 10–CA–17, 2010–Ohio–4861, this Court affirmed a trial court's exclusion of an Excel spreadsheet. We concluded that the proponents of the spreadsheet did not present sufficient evidence to meet the business records exception to the hearsay rule where no one testified as to who prepared the spreadsheet, what that person's job duties were, when the record was prepared, or how the information was collected and compiled. Id. at ¶ 41. However, in the case at bar, the specific information collected, and the manner of collecting and maintaining the information are all set forth by statue.

**{¶38}** In the case at bar, Pharmacy Manager Jacob Metzger testified that the records were made in the ordinary course of CVS business and that he was familiar with the process of selling pseudoephedrine and the records of those sales. Furthermore, the authentication affidavit provided the necessary information regarding the maintenance and retrieval of those records and verified that the records were what they purported to be.

**{¶39}** Pharmacist Jody Ludwick testified about the records documenting Coleman's April 15 and May 18, 2014 pseudoephedrine purchases from the Ontario Wal-Mart and Coleman's May 19, 2014 pseudoephedrine purchase from the Mansfield Wal-Mart. Ludwick testified that the purchase records were kept in the ordinary course of Wal-Mart's business. Ludwick further testified testimony that she is familiar with the

process of selling pseudoephedrine, i.e. identification requirements and "meth checks." The certification of accuracy provided by Wal-Mart's records custodian verified that the records were what they purported to be.

{¶40} Pharmacist Nicole Fulks testified about the records documenting Coleman's May 16, 2014 pseudoephedrine purchase from the Mansfield Kroger. Fulks testified that the records were kept in the ordinary course of Kroger's business. Fulks testified she is familiar with the process of selling pseudoephedrine, i.e. identification requirements and "meth checks."

{¶41} In *State v. Hood*, the Ohio Supreme Court observed,

> A "qualified witness" for this purpose [Evid.R. 803(6)] would be someone with "enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business." 5 McLaughlin, Weinstein's Federal Evidence, Section 803.08[8] [a] (2d Ed.2009); *United States v. Lauersen*, 348 F.3d 329, 342 (2d Cir.2003).

135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, ¶40.

{¶42} In the case at bar, each witness testified that the records were kept in the ordinary course of business and each had enough familiarity with the record keeping to explain how the records came in to existence in the ordinary course of business. Accordingly, the reports were admissible under Evid.R.803 (6) and counsel was not ineffective in failing to object to the records or the testimony concerning the records.

{¶43} Coleman's first assignment of error is overruled.

II.

{¶44} In his second assignment of error, Coleman argues he was improperly convicted on Counts 1 and 2, as they were allied offenses of similar import. Coleman was convicted On Count 1 for Illegal Manufacture of Methamphetamine in the Vicinity of a Juvenile, a first degree felony pursuant to R.C. 2925.04(A) & (C)(3)(b) and on Count 2 for Illegal Assembly or Possession of Chemicals for Manufacturing of Methamphetamine in the Vicinity of a Juvenile, a second degree felony pursuant to R.C. 2925.041 (A) & (C)(2).

{¶45} R.C. 2925.041 governs assembly or possession of chemicals used to manufacture controlled substance with intent to manufacture controlled substance,

> (A) No person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code.

{¶46} R.C. 2925.04 governs illegal manufacture of drugs,

> (A) No person shall knowingly cultivate marihuana or knowingly manufacture or otherwise engage in any part of the production of a controlled substance.

{¶47} R.C. 2941.25, Multiple counts states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶48} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892[1] the Ohio Supreme Court revised its allied-offense jurisprudence,

1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors-the conduct, the animus, and the import.

2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

*Ruff,* at syllabus. The Court further explained,

A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate,

---

[1] *Ruff* was decided March 25, 2015, before Coleman filed his brief in this Court on May 26, 2015.

identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation.

**{¶49}** In the case at bar, the police did not find an active cook upon their entry into the bedroom. Nor did the police find any of the pseudoephedrine that Coleman had purchased between April 10, 2014 and May 19, 2014.

**{¶50}** The trial court instructed the jury that to find Coleman guilty of illegal manufacture of drugs the jury would have

> to find beyond a reasonable doubt that between April 1st and June 7th, this year, 2014...Ray Coleman knowingly aided and abetted another person in manufacturing or otherwise engaging in any part of the production of methamphetamine.

**{¶51}** The trial court instructed the jury that to find Coleman guilty of illegal assembly or possession of chemicals for the manufacture of methamphetamine the jury would have

> to find beyond a reasonable doubt that between April 1st and June 7th, 2014...Mr. Coleman knowingly assembled or possessed chemicals that may be used to manufacture ...with the intent to manufacture a Schedule 2 controlled substance.

2T at 346-347.

**{¶52}** Applying the facts to Coleman's actions as they were charged, we find the possession of chemicals and the engagement in any part of the production of drugs are allied offenses that did not cause separate harm, were not committed separately and do not have a separate animus. *See, State v. Stevenson*, 5th Dist. Perry No. 09CA16,

2010-Ohio-2060, ¶32 (applying the pre-*Ruff* allied offenses test set forth in *State v. Cabrales*, 118 Ohio St.3d 54, 886 N.E.2d 181, 2008-Ohio-1625 and finding the possession of chemicals and the engagement in any part of the production of drugs are allied offenses that do not have a separate animus); *State v. Collins*, 12th Dist. Clinton Nos. CA2010-12-021, CA2010-12-022, 2012-Ohio-430 (applying the pre-*Ruff* allied offenses test set forth in *State v. Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314).

{¶53} In *State v. Damron*, 129 Ohio St.3d 86, 2011–Ohio–2268, 950 N.E.2d 512, the Ohio Supreme Court noted,

> When a defendant has been found guilty of offenses that are allied offenses, R.C. 2941.25 prohibits the imposition of multiple sentences. *Whitfield*, 124 Ohio St.3d 319, 2010–Ohio–2, 922 N.E.2d 182, at ¶ 12. Therefore, a trial court must merge the crimes into a single conviction and impose a sentence that is appropriate for the offense chosen for sentencing. *State v. Brown*, 119 Ohio St.3d 447, 2008–Ohio–4569, 895 N.E.2d 149, at ¶ 41–43. In this case, the sentencing court found Damron guilty of both offenses and sentenced him on both. The imposition of concurrent sentences is not the equivalent of merging allied offenses.

Id. at ¶ 17.

{¶54} The Court in *State v. Whitfield*, 124 Ohio St.3d 319, 2010–Ohio–2, 922 N.E.2d 182, at ¶ 12.*Whitfield* further held,

> If, upon appeal, a court of appeals finds reversible error in the imposition of multiple punishments for allied offenses, the court must reverse the judgment of conviction and remand for a new sentencing

hearing at which the state must elect which allied offense it will pursue against the defendant. On remand, trial courts must address any double jeopardy protections that benefit the defendant...

*Whitfield,* supra at ¶ 25.

**{¶55}** In cases in which the imposition of multiple punishments is at issue, R.C. 2941.25 (A)'s mandate that a defendant may only be "convicted" of one allied offense is a protection against multiple sentences rather than multiple convictions. *See, e.g., Ohio v. Johnson*, 467 U.S. 493, 498, 104 S.Ct. 2536, 81 L.Ed.2d 425(1984). A defendant may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses. *State v. Brown*, 119 Ohio St.3d 447, 2008–Ohio–4569, 895 N.E.2d 149, ¶ 42. Because R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing. *State v. Whitfield*, 124 Ohio St .3d 319, 2010–Ohio–2, 922 N.E.2d 182, ¶27. Thus, the trial court should not vacate or dismiss the guilt determination on each count. Id. Pursuant to *Damron*, the imposition of concurrent sentences is not the equivalent of merging allied offenses.

**{¶56}** Coleman's second assignment of error is granted.

**{¶57}** Pursuant to *Whitfield,* supra, the sentences are vacated and the matter is remanded to the trial court for resentencing where the state must elect the offense for which appellant should be punished.

III.

**{¶58}** In his third assignment of error, Coleman contends the trial court abused its discretion by not allowing his trial counsel to describe an alleged methamphetamine lab discovered at Charlie and Deanna's new address during opening statement.

**{¶59}** In his opening statement, Coleman argues that he attempted to plant the seed that there were different possible perpetrators to the crimes in question,

MR. THOMPSON: ...Finally, I believe there is going to be evidence introduced showing that when the police responded to 352$^1$/2 Boston Avenue they became aware of a potential kidnapping involving Julie Starcher's grandson Austin. It was received in the form of a test message. Law enforcement took it seriously. And the two people believed to be involved in this kidnapping were Charlie Ledbetter and Deana Hebert.

Why is this important? It is important because as a result of that phone call law enforcement had the opportunity to respond to 1095 Koogle Road, Apartment No. 2, on June 7th. The same day as we're talking about.

MS. WOODWARD: Your Honor, may we approach?

I believe he's about to get into facts relating to a different meth lab at a different location, which I believe has no relevancy, other than a commonality of parties, to anything that's alleged to have been done by this defendant in this case. In other words, we are attempting to prove only that he committed acts with regard to Boston. We are not alleging he did anything with regards to Koogle Road.

MR. THOMPSON: My response would be, Your Honor, I have been provided information indicating that not only Ray Coleman was purchasing this Sudafed, but also Deanna Hebert and Mr. Ledbetter. I will be arguing that the chemicals involved, that were found at 1095 Koogle Road, and parts of that production system, were the same parts, the same chemicals that were involved at the Boston Avenue address. I do believe it is relevant because it shows or at least indicates that different persons could have been involved with both labs. And I believe it is relevant.

MS. WOODWARD: I would have no objection to him producing evidence concerning their involvement in this property. I would consider that potentially relevant to this charge in this case, but flipping is not necessarily, in my opinion, proper, and I don't think it's relevant.

MR. THOMPSON: I mean, the police are there investigating a meth lab when the kidnapping call comes in. The kidnapping call is, this is a blanking ransom, bring me money or Sudafed. We've got all the same sort of materials, the same chemicals. I believe it is relevant...

THE COURT: Here is what I suggest, don't put it in your opening statement. Then when you think you've got a basis, you think it's relevant, then tell me and then I will let you put it in front of the jury. I am concerned it's not relevant, so keep it out of your opening statement. That way we will avoid any problems.

1T. at 127-132.

**{¶60}** It appears that the trial court's ruling was in the nature of the granting of a motion in limine. In *State v. Grubb*, the Ohio Supreme Court defined a motion in limine,

> Thus, a motion *in limine,* if granted, is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issue. In virtually all circumstances finality does not attach when the motion is granted. Therefore, should circumstances subsequently develop at trial, the trial court is certainly at liberty " * * * to consider the admissibility of the disputed evidence in its actual context."
>
> *State v. White* (1982), 6 Ohio App.3d 1, at 4, 451 N.E.2d 533.

28 Ohio St.3d 199, 201-202, 503 N.E.2d 142(1986). Thus, in the case at bar, the trial court did not enter a blanket prohibition excluding any mention or evidence of the alleged methamphetamine lab discovered at Charlie and Deanna's new address; rather the trial court simply ruled that no mention be made until a proper foundation for the admissibility of the evidence be shown.

**{¶61}** Coleman does not allege that the trial court prohibited him from seeking to introduce evidence of the alleged methamphetamine lab discovered at Charlie and Deanna's new address. Nor does Coleman cite to any portion of the transcript where he presented this evidence or the trial court denied him the opportunity to present such evidence. Opening statements are not testimonial evidence and may not be considered as such. *Maggio v. Cleveland*, 151 Ohio St. 136, 38 O.O. 578, 84 N.E.2d 912(1949). None of Coleman's purported comments at issue here was supported by evidence subsequently offered at trial. Thus, Coleman has failed to establish that any error occurred. *See, e.g., State v. Davis*, 62 Ohio St.3d at 337, 581 N.E.2d 1362; *State v.*

*Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶157. Moreover, the trial court instructed the jury that it must decide the case on the evidence and that opening statements and closing arguments are not evidence. In *Drake v. Caterpillar Tractor Co.*, 15 Ohio St.3d 346, 474 N.E.2d 291(1984) the Supreme Court noted,

> However, it is improper for counsel to comment on evidence which was excluded or declared inadmissible by the trial court or otherwise make statements which are intended to get evidence before the jury which counsel was not entitled to have the jury consider.

{¶62}   Accordingly, if the facts were not in evidence and not attempted to be placed in evidence there can be no error.

{¶63}   Coleman's third assignment of error is overruled.

{¶64} Accordingly, the judgment of the Richland County Court of Common Pleas is affirmed, in part and reversed, in part. In accordance with the Ohio Supreme Court's decision in *State v. Whitfield*, 124 Ohio St .3d 319, 2010–Ohio–2, 922 N.E.2d 182, we remand this case to the trial court for further proceedings consistent with that opinion. This decision in no way affects the guilty verdicts issued by the jury. It only affects the entry of conviction and sentence. Coleman's convictions are affirmed.

By Gwin, P.J.,

Farmer, J., and

Delaney, J., concur