[Cite as *State v. McDonald*, 2016-Ohio-2699.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. Sheila G. Farmer, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| SHELLEY L. MCDONALD | : | Case No. 15-CA-45 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Court of Common
                                 Pleas, Case No. 15-CR-41



JUDGMENT:                        Affirmed



DATE OF JUDGMENT:                April 25, 2016




APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

ANDREA K. GREEN                           SCOTT P. WOOD
239 West Main Street                      120½ East Main Street
Suite 101                                 Lancaster, OH  43130
Lancaster, OH  43130

*Farmer, P.J.*

{¶1} On January 20, 2015, the Fairfield-Hocking Major Crimes SCRAP Unit received an anonymous tip of a possible methamphetamine lab on Sells Road in Lancaster, Ohio, and a male, Cheyenne McDonald, would be involved in manufacturing methamphetamine. Law enforcement officers called an apartment complex on Sells Road, the Lancaster Club Apartments, and found Apartment F1 was leased to Mr. McDonald's wife, appellant, Shelley McDonald, and Mr. McDonald was listed as a guest. A check of NPLEx (National Precursor Law Enforcement Exchange) records indicated both appellant and her husband had purchased or attempted to purchase pseudoephedrine on numerous occasions within the preceding thirty days, a primary component in the production of methamphetamine.

{¶2} Once at the apartment, law enforcement officers heard voices and movement within the apartment and repeatedly knocked on the door, but no one answered. Neighbors informed the officers of a possible domestic disturbance at the apartment earlier in the day. Assistant property manager, Kelsey Gill, arrived on the scene and unlocked and opened the door. She called out, and appellant appeared at the doorway and was joined thereafter by her husband.

{¶3} The officers asked for permission to enter the apartment to speak with them and Mr. McDonald gave the officers permission to enter. The officers discussed with appellant and her husband the reported domestic disturbance and the anonymous tip. Incriminating evidence indicating the use of methamphetamine was discovered in plain view. As a result, a search warrant was obtained and upon execution, the officers discovered evidence of the manufacture of methamphetamine.

{¶4}    On January 30, 2015, the Fairfield County Grand Jury indicted appellant on one count of illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.041(A), and one count of endangering children in violation of R.C. 2919.22(B)(6).

{¶5}    On March 5, 2015, appellant filed a motion to suppress, claiming the officers unlawfully entered her apartment without a warrant and without probable cause.  A hearing was held on April 15, 2015.  By journal entry filed May 19, 2015, the trial court denied the motion.

{¶6}    A bench trial commenced on June 30, 2015.  The trial court found appellant guilty as charged.  By judgment entry filed July 30, 2015, the trial court sentenced appellant to three years in prison.

{¶7}    Appellant filed an appeal and this matter is now before this court for consideration.  Assignments of error are as follows:

I

{¶8}    "THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS."

II

{¶9}    "THE TRIAL COURT ERRED IN ADMITTING HEARSAY EVIDENCE AT TRIAL."

III

{¶10}  "THE VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

I

{¶11} Appellant claims the trial court erred in overruling her motion to suppress, as the officers' request for the assistant property manager to open the door was unconstitutional and this unconstitutional intrusion negated the subsequent consent to enter. We disagree.

{¶12} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *State v. Fanning,* 1 Ohio St.3d 19 (1982); *State v. Klein,* 73 Ohio App.3d 486 (4th Dist.1991); *State v. Guysinger,* 86 Ohio App.3d 592 (4th Dist.1993). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *State v. Williams,* 86 Ohio App.3d 37 (4th Dist.1993). Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry,* 95 Ohio App.3d 93 (8th Dist.1994); *State v. Claytor,* 85 Ohio App.3d 623 (4th Dist.1993); *Guysinger.* As the United States Supreme Court held in *Ornelas v. U.S.,* 517 U.S. 690, 116 S.Ct. 1657, 1663 (1996), "…as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal."

{¶13}  In its May 19, 2015 journal entry denying the motion to suppress, the trial court reached two pivotal conclusions that were consistent with the evidence.  One, the anonymous tip was vague, unverifiable, and insufficient to establish probable cause to obtain a search warrant, and two, the unlocking and opening of the apartment door by the assistant property manager was a "State-initiated search."

{¶14}  Although the trial court's second conclusion could be questioned because neighbors had informed the officers of a possible ongoing domestic disturbance in the apartment (T. at 77-78), we find the trial court's conclusion is not unreasonable given the fact that the officers did not hear an indication of a domestic disturbance when they were first knocking.  T. at 16-17, 57-58, 89-90.  In addition, the assistant property manager admitted she unlocked and opened the apartment door at the request of the officers, not because of a reported domestic disturbance.  T. at 104-105, 106-107, 110-111.

{¶15}  After the assistant property manager unlocked and opened the door and yelled out, appellant came to the door, followed by her husband.  T. at 108.  The officers stood out on the porch and did not enter the apartment.  T. at 22-24, 79, 108-109, 114. The officers asked to enter the apartment to speak with them and Mr. McDonald gave the officers consent to enter.  T. at 24-25, 79, 82-83.  The officers discussed with them the domestic disturbance complaint and the anonymous tip.  T. at 25.  The officers asked if there was anything illegal in the apartment and appellant stated there "might be a marihuana pipe that was in the hall closet."  T, at 26, 86.  She gave the officers consent to search the hallway closet, but nothing was found.  *Id.*  One of the officers could see into the kitchen from his location in the hallway.  T. at 85.  The officer observed "a plate that was on the counter between the stove and the refrigerator that had - - looked like

some powder or something on it.  It had a baggie and a razor blade right there." T. at 83-84.  The officer opined it appeared to be methamphetamine.  T. at 84.  When questioned about the substance, Mr. McDonald stated a neighbor had been over earlier and "was snorting methamphetamine off the plate." T. at 27.  Based on this admission and these observations, one of the officers left to obtain a search warrant.  T. at 27, 86-87.

{¶16}  The specific question posed by these facts is whether the illegal unlocking and opening of the apartment door by the assistant property manager was cured by the subsequent consent to enter.

{¶17}  It is axiomatic that the plain view doctrine must first be predicated upon a lawful intrusion.  *Harris v. United States,* 390 U.S. 234 (1968); *Horton v. California,* 496 U.S. 128 (1990); *State v. Robinson,* 103 Ohio App.3d 490 (1st Dist.1995); *State v. Howard,* 75 Ohio App.3d 760 (4th Dist.1991).  In *Robinson* and *Howard,* any evidence seized was suppressed because the officers therein committed unlawful intrusions into the defendants' residences and consent had not been given.  The pivotal issue recognized in *Robinson* and *Howard* was the lack of subsequent consent.

{¶18}  In the case sub judice, two officers testified to consent being given to enter the apartment.  Therefore, we conclude the plain view observations and the subsequent search via a search warrant did not violate constitutional principles against illegal search and seizure.

{¶19}  Upon review, we find the trial court did not err in denying the motion to suppress.

{¶20}  Assignment of Error I is denied.

II

{¶21} Appellant claims the trial court erred in permitting evidence of NPLEx (National Precursor Law Enforcement Exchange) records, as they were introduced solely through the testimony of one of the officers and three pharmacy employees, none of whom testified to the compilation of the records and for what reason.  We disagree.

{¶22} The admission or exclusion of evidence lies in the trial court's sound discretion.  *State v. Sage,* 31 Ohio St.3d 173 (1987).  In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment.  *Blakemore v. Blakemore,* 5 Ohio St.3d 217 (1983).

{¶23}  In admitting the NPLEx records, the trial court found Evid.R. 803(8) applied.  T. at 204.  Evid.R. 803 governs hearsay exceptions.  Subsection (8) states the following:

> **(8) Public Records and Reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.

{¶24}  In addition, Evid.R. 803(6) states the following:

**(6) Records of Regularly Conducted Activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

{¶25} The primary ingredient in making methamphetamine is pseudoephedrine. T. at 17. The legal limit for purchasing pseudoephedrine is nine grams per thirty days. T. at 25, 194, 201-202. Pharmacies are required to maintain a logbook of pseudoephedrine purchases pursuant to statute [R.C. 3715.05(A)(6)]. T. at 24-25. R.C. 3715.05(A)(6) explains: " 'National precursor log exchange' or 'exchange' means the electronic system for tracking sales of pseudoephedrine products and ephedrine products on a national basis that is administered by the national association of drug diversion investigators or a successor organization." If a person attempts to purchase more than the legal amount, the "system will shut [the sale] down." T. at 202.

{¶26} Detective Roger Haley, one of the officers involved in investigating the anonymous tip, testified to the process involved in purchasing pseudoephedrine from a pharmacy (T. at 24-26):

A. You provide identification, a photo ID, and then you have to sign a signature log. And then what the pharmacist will do - - or the technician there, the assistant will scan that driver's license through a machine that will permit the purchase or deny the purchase. And the reason that that would happen is, because you can only purchase nine grams in any 30-day period, nine grams of pseudoephed in any 30-day period.

Q. What happens if you exceed that or attempt to exceed that limit?

A. Typically, you're blocked. On a rare occasion, I've seen where it's noted as an exceedance. I don't know if that is the assistant, if that's an error on their part allowing the purchase, or maybe that's a malfunction with the machine in which they're scanning the driver's license through. But most of the time, you'll see a block and it won't allow it to happen.

Q. Is there a database that maintains that information regarding the sale?

A. Yes. It's NPLEx, and that stands for National Precursor Law Enforcement Exchange.

Q. Do you have access to that database?

A. Yes, I do.

***

Q. What other sort of information does an NPLEx record give you?

A. It gives the name of the person. It'll give the date and time of the purchase, what store it's purchased from. It will indicate that it's either a successful purchase, an attempt, a block. It'll also show the product in which you're buying. And it'll show the amount of grams per box when you make that purchase.

{¶27} Detective Haley and three pharmacists testified as to the NPLEx records for the purchase or attempted purchase of pseudoephedrine by appellant. T. at 44-49, 206-207, 231-234, 252-253; State's Exhibit 2. The pharmacists identified the records from their respective stores and the purchases and blocks contained in the exhibit, as well as appellant's purported signature on the records. The pharmacists testified they were familiar with the process of selling pseudoephedrine and the records of those sales. T. at 193-194, 201-203, 224-226, 228, 244-247, 249-252; State's Exhibit 57.

{¶28} In *State v. Coleman,* 5th Dist. Richland No. 14-CA-82, 2015-Ohio-3907, ¶ 35-36, we approved the method of introduction of NPLEx records:

All pharmacies must maintain a log book detailing the purchase or attempted purchase. All Ohio pharmacies are required by law to report all sales and attempted sales of pseudoephedrine to a central pseudoephedrine clearing house, called NPLEx. The purpose of the NPLEx system is to monitor suspicious purchases of pseudoephedrine tablets. All purchase requests are submitted by the pharmacy to NPLEx along with the

customer's driver's license. All such transactions are recorded and the information is available to law enforcement.

The law affirmatively imposes the duty to record and the contents of the record. It can be assumed, therefore, the record was made at or near the time of the purchase or attempted purchase.

In order to properly authenticate business records, a witness must "testify as to the regularity and reliability of the business activity involved in the creation of the record." *Hirtzinger* at 49, 124 Ohio App.3d 40, 705 N.E.2d 395. Firsthand knowledge of the transaction is not required by the witness providing the foundation; however " 'it must be demonstrated that the witness is sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Rule 803(6).' " *State v. Vrona* (1988), 47 Ohio App.3d 145, 148, 547 N.E.2d 1189, *quoting* 1 Weissenberger's Ohio Evidence (1985) 75-76 Section 803.79. See, also, *Moore* at ¶ 18.

*Deutsche Bank National Trust Co. v. Hansen,* 5th Dist. Fairfield No.2010 CA 00001, 2011-Ohio-1223, ¶ 26.

{¶29}  In our review of the testimony of Detective Haley and the three pharmacists, we find the state employed the same method of introduction as we sanctioned in *Coleman.*

{¶30}  Upon review, we find the trial court did not abuse its discretion in permitting the NPLEx records into evidence.

{¶31}  Assignment of Error II is denied.

III

{¶32} Appellant claims her convictions were against the sufficiency of the evidence, as the state failed to prove she simultaneously possessed pseudoephedrine and other household chemicals with the intent to manufacture methamphetamine, and that such possession and intent was within the vicinity or the presence of a juvenile.  We disagree.

{¶33}  On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction.  *State v. Jenks,* 61 Ohio St.3d 259 (1991).  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307 (1979).  We note circumstantial evidence is that which can be "inferred from reasonably and justifiably connected facts."  *State v. Fairbanks,* 32 Ohio St.2d 34 (1972), paragraph five of the syllabus.  "[C]ircumstantial evidence may be more certain, satisfying and persuasive than

direct evidence." *State v. Richey,* 64 Ohio St.3d 353, 1992-Ohio-44. It is to be given the same weight and deference as direct evidence. *Jenks, supra.*

{¶34} Appellant was convicted of assembly or possession of chemicals used to manufacture controlled substance with intent to manufacture controlled substance in violation of R.C. 2925.041(A) and endangering children in violation of R.C. 2919.22(B)(6) which state the following, respectively:

(A) No person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code.

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(6) Allow the child to be on the same parcel of real property and within one hundred feet of, or, in the case of more than one housing unit on the same parcel of real property, in the same housing unit and within one hundred feet of, any act in violation of section 2925.04 or 2925.041 of the Revised Code when the person knows that the act is occurring, whether or not any person is prosecuted for or convicted of the violation of section 2925.04 or 2925.041 of the Revised Code that is the basis of the violation of this division.

{¶35}  We note R.C. 2925.041(B) further provides:

In a prosecution under this section, it is not necessary to allege or prove that the offender assembled or possessed all chemicals necessary to manufacture a controlled substance in schedule I or II.  The assembly or possession of a single chemical that may be used in the manufacture of a controlled substance in schedule I or II, with the intent to manufacture a controlled substance in either schedule, is sufficient to violate this section.

{¶36}  Appellant concedes she possessed pseudoephedrine and other household chemicals used in the manufacturing of methamphetamine, said items were present in her apartment when she was also present, and she and her minor children were together in the apartment.  Appellant's Brief at 8-9.  Appellant argues the state failed to sufficiently prove that she intended to use the pseudoephedrine and other household chemicals to make methamphetamine, that she possessed the items while a juvenile was present, that she had control over the items in her apartment as others where present, that her minor children were present when she possessed the items, that she ever manufactured methamphetamine, that methamphetamine was ever manufactured within the apartment, and that she and her minor children were ever present when methamphetamine was being manufactured.  Appellant's Brief at 9.

{¶37}  Appellant basically concedes the direct evidence against her, but argues there is no nexus between the direct evidence and the convictions.  What is missing from appellant's analysis is the validity of the circumstantial evidence.

{¶38} The circumstantial evidence included the items for the manufacturing of methamphetamine found throughout appellant's apartment, especially in the kitchen and in a trash bag found in the bathroom containing by-products of drug manufacturing. T. at 69-71, 97-99; State's Exhibits 14, 15-23, 46. Numerous items were found indicating manufacturing and methamphetamine. T. at 72-75, 98-100. Appellant was listed as the sole resident of the apartment. T. at 28. A minor child was in the apartment at the time of the search, and the apartment contained various items indicating a child resided therein i.e., baby gate, stroller, toys, pacifier. T. at 58, 61-63, 93.

{¶39} In a taped interview to law enforcement, appellant admitted to purchasing pseudoephedrine for her husband's friend, John Barnes, who she suspected was manufacturing methamphetamine. T. at 113-114, 127, 130-131, 151; State's Exhibit 55. Appellant was told by a pharmacist that pseudoephedrine was used to manufacture methamphetamine after she asked why she had been "blocked" from purchasing it. T. at 115-116. She had made numerous purchases of pseudoephedrine in a short period of time. T. at 136-138, 140. There was evidence that she also purchased lighter fluid, cold packs, and possibly lithium batteries, all items used in the manufacturing of methamphetamine. T. at 120-121, 124, 129. Appellant was paid to purchase the items, and admitted to having used methamphetamine. T. at 125-126, 134-135, 167-168.

{¶40} One does not have to make an inference upon an inference to determine the circumstantial evidence pointed to one conclusion, and that one conclusion was appellant being paid to knowingly supply materials and chemicals necessary to make methamphetamine and to freely permitting the manufacture and assembly in her apartment as evidenced by the items and trash related to the by-products of

methamphetamine manufacturing discovered in her apartment.  Appellant's statements to law enforcement suggested the manufacturing was done while she was sleeping and while her minor child was present.

{¶41}  Upon review, we find sufficient credible evidence to substantiate the trial court's findings of guilty.

{¶42}  Assignment of Error III is denied.

{¶43}  The judgment of the Court of Common Pleas of Fairfield County, Ohio is hereby affirmed.

By Farmer, P.J.

Baldwin, J. concur and

Hoffman, J. concurs separately.


SGF/sg 3/16

*Hoffman, J., concurring*

{¶44} I concur in the majority's analysis and disposition of Appellant's first and third assignments of error.

{¶45} I further concur in the majority's disposition of Appellant's second assignment of error. I write separately only to state I believe the appropriate standard of review to be applied to the particular evidentiary issue raised is whether the trial court erred as a matter of law rather than whether it abused its discretion.[1]

---

[1] *State v. Sage* involved the admission/exclusion of **relevant** evidence.  For a fuller explanation, see my concurring opinion in *State v. Baughman*, Richland No. 13-CA-49, 2014-Ohio-1821.